**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

CASE NO.: 25-cv-21494-KMM

Al Nawas Gampong, on behalf of himself and
All those similarly situated individuals,

Plaintiff,

v.

Flanigan's Management Services, Inc. and Richard
Eaton,

Defendants.
_______________________________________/

# DECLARATION OF JEFFREY KASTNER, ESQ.

I, Jeffrey Kastner, Esq., submit the following declaration:

1. I am over 18 years of age. The facts stated in this affidavit are based on my personal knowledge. I am resident of Broward County.
2. I currently serve as the Chief Financial Officer and General Counsel to Flanigan's Enterprises, Inc., the franchisor of Twenty-Seven Birds, Corp., a Florida corporation, and the general partner of CIC Investors #70, Ltd, a Florida limited partnership.
3. Twenty-Seven Birds, Corp., is the entity which owns the Flanigan's Seafood Bar and Grill located at 2721 Bird Road, Miami, Florida, 33133 (hereafter "Store 18") and employs the workers who attend to that restaurant.
4. CIC Investors #70, Ltd., is the entity which owns the Flanigan's Seafood Bar and Grill located at 12790 S.W. 88th Street, Miami, Florida 33186 and employs the workers who attend to that restaurant.

5. Servers and bartenders at each Flanigan's Seafood Bar and Grill restaurant are employed by the specific entity which owns the location where the server or bartender works.
6. Flanigan's Enterprises, Inc. wholly owns Flanigan's Management Services Inc., which is a bookkeeping, accounting, and human resources entity with no employees who processes the payroll for the employees under the entire Flanigan's Enterprises, Inc. umbrella. Flanigan's Management exerts no supervision, control, authority to hire or fire, or oversight of the workers it pays.
7. The authority to control the manner and means of employment, hire and fire, direct, and supervise each employee of a Flanigan's Seafood Bar and Grill rests on the management of each individual restaurant, with guidance from the corporate office on human resource, corporate-wide quality control, and legal matters.
8. Management at each individual restaurant sets schedules, assigns server and bartender duties, oversees inventory, and decides which serving and bartending-related support duties that are to be performed by each employee on a shift-by-shift basis. As a general matter, Flanigan's Management Services Inc., does not participate in these decisions.
9. Flanigan's restaurants have no corporate-wide policies encouraging or instructing managers or assistant managers to reduce the hours that servers and bartenders have actually worked.
10. Flanigan's restaurants have no corporate-wide policies encouraging or instructing managers or assistant managers to punish workers who perform overtime work in any way.
11. Flanigan's restaurants have no corporate-wide policies encouraging or instructing managers or assistant managers to instruct, demand, tell, or encourage workers to clock

out and work off the clock for any amount of time. Instead, Flanigan's trains its managers and assistant managers to ensure that each worker is paid correctly for every moment they perform work at any of the Flanigan's Restaurants.

12. To enforce this policy, Flanigan's restaurants use a clock-in and clock-out system where each employee uses a personal pin code and a job code to check in and out of work, including checking in and out of server or bartender job codes to staff meetings, cleaning duties, or take-out job codes.

13. To further enforce this policy, each worker, regardless of job classification, is provided weekly access to their time records at their request and a receipt of their clock-in and clock-out record automatically prints at the end of each shift. Attached to this affidavit I have included a sample of the receipt printed at the end of each shift showing the hours worked for each employee, as well as the weekly time records that can be printed at the employee's request. See Exhibit F.

14. Like any other business, Flanigan's restaurants monitor cost of labor both as an expense and as a mechanism to ensure that restaurants are adequately staffed to handle the volume of guests and customers who visit the restaurants.

15. On isolated occurrences, management must adjust time records when workers clock in as the incorrect occupation, for example someone working the take-out counter mistakenly clocks in as a server; when workers forget to clock-in or out; or when a worker unexpectedly leaves the restaurant for a break and comes back without clocking in and out. These adjustments are clearly marked on the time records and recorded by the computer system. The weekly print out that each employee can access shows any such adjustments.

16. I have reviewed the allegations made in Plaintiff's Complaint. Flanigan's strongly disputes the veracity of Plaintiff's allegations and believes that they will be disproven through this litigation.

17. However, for purposes of this affidavit only, Flanigan's will engage with the allegations in the Amended Complaint and in the affidavits filed in support of the Motion for Conditional Class Certification to demonstrate that class certification is inappropriate because the Plaintiff and opt-in Plaintiff's claims must be analyzed individually, do not demonstrate that they are similarly situated, and do not demonstrate that other similarly situated servers and bartenders wish to join the class.

18. In addition, Flanigan's stipulates that should a class be certified in the future, which Flanigan's does not concede is proper, Flanigan's will treat the applicable statute of limitations as beginning to run from the earliest date applicable to Al Nawas Gampong, the named Plaintiff. Flanigan's stipulates that it will not object to any properly presented claims on the basis that they fall outside the applicable limitations period, as long as any additional claims fall within the applicable limitations period established by Al Nawas Gampong's lawsuit.

19. Al Nawas Gampong makes the following sworn statements in support of his Motion for Class Certification:

    a. During pre-shit meetings, "the managers would tell all front-of-the-house employees to clock out after they had cashed out their last table then complete closing side work off the clock."

    b. "Servers and bartenders consistently clocked out early to do their side work to avoid recording overtime."

c. "The restaurant uses a point-of-sale timekeeping system, so you can't clock out while you have open tables, however, as soon as your last table cashes out, the managers told you to clock out and do your side work off the clock."

20. Mr. Gampong's sworn statements detailed above are false, and demonstrate the need to analyze and determine this case on a detailed employee-by-employee, shift-by-shift, and hour-by-hour basis. Flanigan's detailed time records and customer receipts conclusively establish the falsity of Mt. Gampong's sworn statements and the inappropriateness of class wide relief for his claims.

21. To determine whether Mr. Gampong's claims are individualized or a product of some undisclosed policy implemented by Store 18 manager Richard Eaton, Flanigan's analyzed Mr. Gampong's time records and the receipts for his latest table on each of his shifts. A table showing this analysis is attached as Exhibit A to this declaration. The opt-in plaintiff's time records, including Mr. Gampong, are attached as Exhibit D to this declaration. Mr. Gampong's receipts for his latest tables on each of his shifts are attached as Exhibit E.

22. Mr. Gampong clocked in approximately 237 times while he worked at Store 18 from June 2024 through February, 2025. During his first weeks on the job he was classified as "Training" and paid full minimum wage for all hours worked. Separately, he also attended staff meetings, attended the take-out counter, performed opening side duties for an hour before the restaurant opened, and participated in Store 18 cleaning activities, each of these sets of duties are accounted for with a separate clock in time code and are paid at full minimum wage. See Exhibit D.

23. For the times where Mr. Gampong clocked in as a "server" the time records overwhelmingly establish the falsity of his sworn claim that he was instructed to clock out as soon as the last table closed their check and perform side work off the clock. See Exhibit A. I note several shifts as examples below:

    a. On June 19, 2024, Mr. Gampong's first post-training shift, his final check closed its tab at 6:07 PM and Mr. Gampong did not clock out until 6:51 PM.

    b. On September 23, 2024, the final check closed at 7:25 PM and Mr. Gampong clocked out at 7:51 PM.

    c. On December 9, 2024, the final check closed at 2:24 PM and Mr. Gampong clocked out at 2:52 PM.

    d. On February 5, 2025, the final check closed at 1:00 AM and Mr. Gampong clocked out at 1:35 AM.

    e. On his final shift February 28, 2025, the final check closed at 5:43 PM and Mr. Gampong clocked out at 7:44 PM.

24. Store 18 is continuing its investigation of Mr. Gampong's claims and continuing to gather records, however this initial evidence establishes that Store 18 maintained contemporaneous time records which will eventually require the fact finder in this case to examine each shift to determine whether Mr. Gampong, individually, worked any hours for which he was not properly paid. The time records demonstrate that an across-the-board ruling applicable to a class is improper because no policy requiring servers to clock out and perform work off the clock is demonstrated, and therefore, other servers are not similarly situated to Mr. Gampong.

25. Flanigan's has performed similar analysis for opt-in plaintiffs Brianna Everett and Maxwell Morris. The results are the same as those indicated above for Mr. Gampong.

26. In Maxwell Morris' case, Mr. Morris submitted a sworn statement claiming:

    a. "I worked more than 40 hours per week in many weeks, but the Restaurant did not record or pay me for these overtime hours."

    b. "The managers- including Eaton- told me to clock out before my required closing side work, so that I would not clock more than forty hours per week."

    c. "The restaurant uses a point-of-sale timekeeping system, so you can't clock out while you have open tables, however, as soon as your last table cashes out, the managers told you to clock out and do your side work off the clock."

27. Analysis of Mr. Morris' time records show these claims to be false. For example:

    a. Mr. Morris earned overtime pay for hours worked over forty per week on the following dates: July 17, 2023; March 30, 2024; June 1, 2024; June 6, 2024; and June 14, 2024. See Exhibit D.

    b. A comparison of Mr. Morris' clock out times and his last check shows he regularly clocked out well after his last check closed. See Exhibit C. For example, August 31, 2023 final check 5:14 PM and clock out 6:02 PM; November 17, 2023 final check 6:57 PM and clock out 7:30 PM; January 25, 2024 final check 6:05 PM and clock out 6:24 PM. This trend continues throughout the records.

    c. Mr. Morris' electronic time records show that on many weeks of his employment, Mr. Morris came nowhere near working 40 hours in one 7-day period and these weeks show no adjustments by any managers.

28. Ms. Everett's affidavit echoes the same claim made by Mr. Gampong and Mr. Morris, stating verbatim, "The restaurant uses a point-of-sale timekeeping system, so you can't clock out while you have open tables, however, as soon as your last table cashes out, the managers told you to clock out and do your side work off the clock."

29. Ms. Everett's time records and last-check comparison analysis show her sworn statement is not correct. See Exhibit B. For example:

    a. On December 7, 2023 her last table cashed out at 5:12 PM and she clocked out at 6:09 PM.

    b. On February 4, 2024 the last table cashed out at 12:57 AM and she clocked out at 1:35 AM.

    c. On April 14, 2024, while working as a bartender, her last customer paid at 7:47 PM and she clocked out at 8:33 PM.

    d. On October 20, 2024, while working as a bartender, her last customer paid at 7:48 PM and she clocked out at 8:18 PM.

    e. On November 12, 2024, while working as a bartender, her last customer paid at 5:34 PM and she clocked out at 6:04 PM.

30. The significant discrepancies between the opt-in plaintiff's allegations and their electronic time records means that Flanigan's will need to examine each individual's allegations, receipts, and time records to cross examine each potential claimant, resulting in a trial that will require the jury to make individualized findings to each potential plaintiff.

31. At least one other former employee has signed a sworn statement stating that she will not join this action should a class be certified. Additionally, Ms. Protacio has confirmed that

the Plaintiff's allegations are unfounded. This further confirms that trial in this case will involve fact specific inquiries to each individual.

Under penalty of perjury, I declare that the foregoing affidavit is true and correct.

JEFFREY KASTNER, ESQ.
Dated: 5/28/2025